**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THADDEUS JAMES THOMAS, | : | |
| Plaintiff, | : | |
| v. | : | |
| CHRIS CHRISTIE et al., | : | Civil Action No. 10-1887 (DRD) |
| Defendants. | : | |
| THADDEUS JAMES THOMAS, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 10-5026 (DRD) |
| SHANTAY BRAME ADAMS, et al., | : | |
| Defendants. | : | |
| RONALD NASH, | : | Civil Action No. 10-2113 (DRD) |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| CHRIS CHRISTIE et al., | : | **APPLIES TO ALL ACTIONS** |
| Defendants. | : | |

These matters come before the Court, jointly, upon plaintiff Thaddeus James Thomas'

("Thomas") filing of a supplement to his complaint submitted in Civil Action No. 10-1887 (DRD)

and his filing of another civil complaint in Civil Action No. 10-5026 (DRD) .

Thomas is the plaintiff in Civil Action No. 10-1887 (DRD) and Civil Action No. 10-5026 (DRD), while Ronald Nash ("Nash") is the plaintiff in Civil Action No. 10-2113 (DRD).  Both Thomas and Nash (hereinafter, collectively, "Plaintiffs") are individuals involuntarily committed pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24, et seq.  Both Plaintiffs seek to bring their respective actions in forma pauperis.  Based on their affidavits of indigence, the Court will grant Thomas and Nash's applications to proceed in forma pauperis, pursuant to 28 U.S.C. § 1915(a) (1998), and will order the Clerk of the Court to file Plaintiffs' complaints.

## I.    BACKGROUND

Thomas' complaint filed in Civil Action No. 10-1887 (DRD) ("Complaint I") asserted that, on March 17, 2010, Thomas, while being confined at the Special Treatment Unit of the Northern Regional Unit, at Kearney, New Jersey ("Kearney Facility"), attended a community meeting during which he was informed about the then-upcoming transfer of all civilly committed individuals confined at the Kearney Facility, Thomas and Nash included, to the East Jersey State Prison ("EJSP") in Rahway, New Jersey.[1]  See Civil Action No. 10-1887, at 8.  Thomas'

---

[1]  The background of the transfer of Kearney Facility residents was provided by in the decision issued by Honorable Dennis M. Cavanaugh ("Judge Cavanaugh") in 2009 N.J. Super LEXIS 1188, Civil Action No. 01-cv-0789 (DMC) (N.J.D.), Docket Entry No. 115("Alves").  In Alves, Judge Cavanaugh noted that,

> [p]ursuant to County of Hudson v. State of New Jersey, the State of New Jersey [was] required to turn over the premises of the [Kearny F]acility to the County of Hudson by May 19, 2010.  See [County of Hudson v. State Dep't of Corr., 2009 N.J. Super. LEXIS 1188 (N.J. Super. App. Div. May 18, 2009)].  Accordingly, the State [had to] locate another temporary or permanent facility to house the [civilly committed individuals] currently living [in the Kearney Facility].

Id. at 2.  The Alves decision also noted that the residents of the Kearny Facility were initially

Complaint I also asserted that, on March 25, 2010, a memorandum was circulated among the

residents of the Kearney Facility informing them that  they could not "order" personal

belongings, such as food and clothing, in light of their upcoming transfer to the EJSP.  See id.

Therefore, in his Complaint I – drafted in anticipation of his transfer to the ESJP –

Thomas asserted two lines of claims: (a) one alleging that such transfer, if executed, would

subject Thomas to confinement in prison-like conditions, granted that the EJSP is structured and

administered as a correctional facility rather that as a treatment unit, see id. at 9; and (b) the other

line of claims alleging that the transfer would effectively deprive Thomas from an opportunity to

have continuos treatment necessary for his recovery.  See id.

On May 20, 2010, the Clerk received two documents from Thomas; one notifying the

Court that Thomas' transfer (same as all Kearney Facility residents' transfer) to the EJSP did, in

fact, take place, see Civil Action No. 10-1887, Docket Entry No. 3, while another informing the

Court that Thomas' psychiatric therapy has been, in fact, halted as a result of the transfer.  See

id., Docket Entry No. 4.  The Court, therefore, issued an order directing Thomas to elaborate on:

(a) the frequency of the mental therapy Thomas was receiving at the Kearney Facility; (b) the

frequency of the mental therapy, if any, Thomas began receiving at the EJSP; and (c) the gap

between treatments that Thomas suffered as a result of his transfer to the EJSP.  See id. Docket

Entry No. 5.  In response, Thomas submitted a supplement to his Complaint I; the supplement

_____

scheduled to be relocated to the Special Treatment Unit in Avenel, New Jersey (i.e., a facility
located near the EJSP and substantively indistinguishable from the Kearney Facility in the sense
that it was already used to house civilly committed individuals), but eventually the plans
changed, and the civilly committed individuals from the Kearney Facility were re-destined to be
housed at an administrative segregation unit actually located within the EJSP itself.  See id. at 4.

clarified that, although Thomas' mental therapy was swiftly resumed upon his arrival to the

EJSP, the extent/depth (and – seemingly – the frequency) of Thomas' mental therapy provided at

the EJSP was substantively less than that provided to Thomas at the Kearney Facility.[2]  See id.,

Docket Entry No. 6.  Nash's allegations, also less factually developed, suggested the same.  See

generally, Civil Action No. 10-2113, Docket Entry No. 1.

Finally, on October 1, 2010, the Clerk docketed another civil complaint from Thomas;

that complaint asserted that, after his transfer to the EJSP, Thomas was placed in segregated

confinement, which completely prevented his access to therapy.  See Civil Action No. 10-5026

(DRD).  In his two actions, Thomas moved this Court for appointment of pro bono counsel and

injunctive relief.

## II.   STANDARDS OF REVIEW

A district court is required to review a complaint in a civil action where the litigant is

proceeding in forma pauperis.  Specifically, the court is required to identify cognizable claims

and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which

relief may be granted, or seeks monetary relief from a defendant who is immune from such relief,

pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Plaintiffs are proceeding in forma

pauperis in both above-captioned matters, their complaints are subject to sua sponte screening for

dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a pro se complaint, the Court must be mindful to

construe it liberally in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007);

_____

[2]  In addition, Thomas asserted that EJSP officials have began preventing Thomas'
communications to this Court.  See Civil Action No. 10-1887, Docket Entry No. 8.

see also United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a pro se plaintiff's "bald assertions" or "legal conclusions."  Id.

Moreover, recently, the Supreme Court clarified the standard for summary dismissal in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), stressing that Rule 8(a)(2) of the Federal Rules of Civil Procedure mandates a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2).  Citing its prior decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 555), the Supreme Court identified two working principles underlying the failure to state a claim standard:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ... .  Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S. Ct. at 1949-1950 (citations omitted).

The Court further explained that

a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.

> While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 1950; see also Twombly, 505 U.S. at 555, & n.3; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

Consequently, the Third Circuit observed that Iqbal provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[3] that applied to federal complaints before Twombly. Fowler, 578 F.3d at 210. The Third Circuit now requires a district court to conduct the two-part analysis set forth in Iqbal when presented with a motion to dismiss, specifically:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 129 S.Ct. at 1949-50]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id.] In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" Iqbal, [129 S.Ct. at 1949-50]. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

## III.   **SECTION 1983 ACTIONS**

Section 1983 provides in relevant part:

---

[3] In Conley, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Id., 355 U.S. at 45-46. Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

## IV.   DISCUSSION

### A.   The New Jersey Sexually Violent Predator Act

The New Jersey SVPA, N.J.S.A. 30:4-27.24 et seq., provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP").[4]  N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, N.J.S.A. 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b).  The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in

---

[4]  The SVPA defines a SVP as

a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

consultation with  of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 (C. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators."[5]  N.J.S.A. 30:4-27.34(d).

### B. Quasi-Prison Conditions

The first line of claims asserted by Plaintiffs focuses on the fact of their transfer from a treatment unit (having, seemingly, a rather informal and lenient – in comparison to a correctional facility – administrative regime) to a unit within prison facility, which has a more restrictive regime.[6]  Plaintiffs maintain that such transfer is unconstitutional granted Plaintiffs' status as civilly committed individuals rather than convicted prisoners serving their sentences.

Plaintiffs err.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court of the United States examined the conditions of confinement mandated by Kansas' Sexually Violent Predator Act ("Kansas Act"), a legislation substantively indistinguishable – for the purposes of this Court's analysis – from the SVPA.  The Kansas Act called for confinement of sexually violent predators

---

[5]  In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs.  N.J.S.A. 30:4-27.25.  The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed.  Id.

[6]  Although Plaintiffs paraphrase their allegations in terms of their right to stay, specifically, at the Kearney Facility (or to be transferred, specifically, to the Avenel facility), the Court construes their claims as a generic assertion that Plaintiffs have a right to be housed in a facility located outside prison grounds and/or having administrative regime more lenient than that employed at a correctional facility.  See, e.g., Olim v Wakinekona, 461 U.S. 238, 245-46 (1983) (inmates have no due process right to choose their specific place of confinement); Meachum v. Fano, 427 U.S. 215, 224-25 (1976) (same).

in secure facilities that could be, regime- and conditions-wise, analogized to a correctional facility.[7] <u>See id.</u>, 521 U.S. at 363-64.  The Court, however, concluded that housing of civilly committed individuals at the segregated prison-like unit was not a violation of these individuals' constitutional rights, since the conditions within the unit were essentially the same as those existing in mental hospitals for involuntarily committed persons (and since the residents of the segregated unit were receiving mental treatment under the language of the Kansas Act).  <u>See id.</u>, 521 U.S. at 363, 364, 365-368.  Consequently, the Court held that involuntary confinement under the Kansas Act was not unconstitutional with regard to civilly committed individuals confined within prison grounds, so long as such civilly committed individuals were: (a) segregated from the general prison population; and (b) afforded a treatment comparable to that provided to other civilly committed persons confined in treatment units.  <u>Id.</u>, 521 U.S. at 368-69; <u>see also</u> <u>Seling v. Young</u>, 531 U.S. 250, 261062 (2001) (revisiting the same issue in detail upon examination of the State of Washington's version of the SVPA and, in addition, holding that placement of civilly committed individuals in a unit located within prison grounds and having prison-like administrative regime did not violate the Double Jeopardy Clause was without merit).

In light of the Supreme Court precedent unambiguously established in <u>Hendricks</u> and <u>Seling</u>, Plaintiffs' allegations based on the fact of their transfer to a unit located within the EJSP and administered similarly to a correctional facility are facially without merit and should be

---

[7]  In fact, while deciding <u>Kansas v. Hendricks</u>, the Supreme Court was unambiguously advised that the sexually violent predators in Kansas were to be held in a segregated unit within an actual prison.

dismissed, with prejudice, for failure to state a claim upon which relief can be granted.[8]  See In re Commitment of W.Z., 173 N.J. 109 (2002) (same); accord United States v. Comstock, 130 S. Ct. 1949 (2010) (addressing a federal statute under which federal SVPs – whose prison term expired and civil commitment begun – continued being housed within the same prison facility where they have actually served their sentences).

###   C.    Limited Recreation Time

Plaintiffs' complaints also assert that the conditions of confinement at the EJSP violate their rights because these conditions are excessively restrictive, e.g., in the sense that Plaintiffs might be forced to remain indoors 23 a day, with only one hours of outdoor time in the yard. These allegations also fail to state a cognizable constitutional claim.

Conditions-of-confinement claims of pretrial detainees and civilly committed individuals are examined under the test posed by the Fourteenth Amendment requiring that such individuals would not be subjected to conditions amounting to a punishment imposed without (or prior) to an adjudication.  See Bell v. Wolfish, 441 U.S. 520, 535-39 (1979) (holding that whether conditions of confinement of pretrial detainees violate their constitutional rights if these conditions are imposed as punishment instead of for some legitimate governmental purpose); see also Youngberg, 457 U.S. at 307, 321-22 (constitutionally protected interests of civilly committed persons must be balanced against the reasons put forth by the State for restricting their liberties, and de minimis restrictions on patients' liberties cannot, as a matter of law, amount to a violation

---

[8]  While the Court finds that the housing aspect of Plaintiff's claims has no merit, these Court's conclusions are distinct and different from the Court's analysis with regard to the medical treatment aspect of Plaintiffs' claim; the latter aspect is examined infra.  See this Opinion, "Medical Treatment" section.

of their rights); accord Seling, 531 U.S. at 265 ("due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed").

Here, Plaintiffs assert that their rights are violated by the restriction limiting their recreational time in the yard.  However, the Third Circuit has held that placement of a civilly committed SVP in an inclosed confinement does not violate due process unless it results in a the deprivation which is unrelated to a legitimate penological purposes and, in addition, amounting to a genuine privation.  See Deavers v. Santiago, 243 Fed. App'x 719, 721 (3d Cir. 2007) (applying Sandin v. Conner, 515 U.S. 472 (1995), to segregated confinement of civilly committed SVPs);[9] see also Hubbard v. Taylor, 538 F.3d 229, 235 (3d Cir. 2008) (holding that conditions-of-confinement claims by pretrial detainees must be assessed in light of the totality of the circumstances existing within the institution in order to determine whether the challenges condition amounts to a genuine privation).

Since Plaintiffs' claims asserting limited yard time do not indicate that Plaintiffs are subjected to a genuine privation as a result of their being forced to remain indoors 23 hours a day, such allegations fail to state a claim and will be dismissed with prejudice.  See Diaz v. Cumberlant Cty, 2010 U.S. Dist. LEXIS 101449, at *10-16 (D.N.J. Sept. 23, 2010) (dismissing with prejudice a claim by pretrial detainee asserting that he was availed to only one hour or yard recreation per day and explaining that, in order to assert a deprivation amounting to a punishment

---

[9]  In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest").

imposed in violation of due process, the confined individual claiming insufficient recreation must

state facts showing that denial of recreation was such that it caused injury to his/her ability to

control his/her muscular functions or to maintain his/her range of physical motions) (citing

Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. Ill. 1996) (affirming dismissal of detainee's

claims because "[l]ack of exercise may rise to a constitutional violation in extreme and prolonged

situations where movement is denied to the point that the inmate's health is threatened"); Cary v.

Rose, 902 F.2d 37 (7th Cir. 1990) (where detainees alleged that they were denied adequate

exercise and recreation but admitted that they had room in their cells and in the hallway to run in

place or perform calisthenics, their allegations could not amount to a constitutional claim); Ellis

v. Crowe, 2009 U.S. Dist. LEXIS 125154, at *36 (E.D. La. Dec. 18, 2009) (detainee's claim

should be dismissed if the facts he alleges do not show that he was so deprived of recreation to

suffer a physical injury, such as muscle atrophy or loss of range of motion)).

### D.   Ability to Order Personal Belongings

Plaintiffs also assert that, as a result of their transfer to the EJSP, they have been

prevented from "ordering" personal belongings, such as food and clothing.  This line of

allegations allows for two interpretations, i.e., that: (a) Plaintiff's were prevented from placing

orders for "more" personal belongings (in comparison to what they had already acquired); and (b)

Plaintiffs had to actually forfeit their already-accrued property due to their inability to take all or

some of their personal belongings to the EJSP.   However, regardless of whether Plaintiffs'

allegations are construed as the option "(a)" or option "(b)," Plaintiffs fail to state a cognizable

constitutional claim.

If the Court construes Plaintiffs allegations as a claim that Plaintiffs were prevented from ordering "more" personal belongings, Plaintiffs' complaints are subject to dismissal for failure to assert facts showing either their entitlement to obtaining "more" belongings or a genuine privation resulting from their inability to obtain "more" of such belongings.

In order to assert a deprivation of a constitutionally protected property interest, Plaintiffs must state facts demonstrating "more than an abstract need or desire for [having such property. They] must, instead, have a legitimate claim of entitlement to it," either under state or federal law, Board of Regents v. Roth, 408 U.S. 564, 577 (1972), which – for the purposes of the analysis at hand – means that Plaintiffs must assert facts showing that they had a protected property interest in ordering "more" personal belongings.  See Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).[10]

_____

[10] Alternatively, Plaintiffs have to show that a deprivation they are subjected to by not having "more" belongings produced conditions of confinement amounting to a genuine privation. See Hubbard, 538 F.3d at 235.  However Plaintiffs' complaints are void of any statement suggesting, even vaguely, that Plaintiffs, if prevented from ordering "more" clothing or food, stand to immediately experience such conditions of confinement at the EJSP that these conditions would amount to a genuine privation.  In other words, while the Court can hypothesize that Plaintiffs might, at some point, experience a genuine privation in the event the DOJ's supply of food and clothing deteriorates to the level so low to violate the constitutional minimum, the possibility of Plaintiffs' accruing a claim of genuine privation in the future is of no import for the purposes of the issues at hand: these future claims are, at this juncture, wholly speculative.  Accord Dawson v. Frias, 2010 U.S. Dist. LEXIS 30513, at *8 (D.N.J. Mar. 30, 2010) ("speculation as to what might or might not happen in the future" cannot serve as a basis for a valid claim) (citing Rouse v. Pauliilo, 2006 U.S. Dist. LEXIS 17225 (D.N.J. Apr. 5, 2006) (dismissing speculative claim and citing Kirby v. Siegelman, 195 F.3d 1285 (11th Cir. 1999)); Pilkey v. Lappin, 2006 U.S. Dist. LEXIS 44418, at *45 (D.N.J. June 26, 2006) ("Plaintiff's [anxiety paraphrased as his claim of] fail[s] to state a claim upon which relief may be granted"); Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be found indifferent to an existing condition, not to a speculative future injury)).

Here, however, Plaintiffs' complaints do not assert facts in support of such contention. Indeed, no statement made in Plaintiffs' complaints suggests that they have property interest in ordering "more" items under the state or federal law (and this Court, on its own, is aware of no provision entitling Plaintiffs to ordering "more" personal belongings).[11]  Therefore, this aspect of Plaintiffs' claims will be dismissed with prejudice.

Moreover, if the Court is construe Plaintiffs' claims as asserting that Plaintiffs are being forced to actually forfeit some – or all – property they acquired during they confinement at the Kearney Facility, Plaintiffs' claims are barred by the availability of state post-deprivation remedy.  See Parratt v. Taylor, 451 U.S. 527 (1981) (property loss caused by the intentional acts of government officials does not give rise to a procedural due process claim under § 1983 if an ample post-deprivation remedy exists under state law), overruled on other grounds Daniels v. Williams, 474 U.S. 327 (1986); see also Zinermon v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S. 517 (1984).

Here, the New Jersey Tort Claims Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides an ample post-deprivation remedy to persons who believe they were deprived of property by the acts of state government officials.  See Asquith v. Volunteers of America, 1 F. Supp. 2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d 407 (3d Cir. 1999).  Therefore, Plaintiffs claims

---

[11]  In addition, since the EJSP has a legitimate interest in controlling the maximum amount of personal belongings an inmate may possess/storage at the EJSP, the limitation on the amount of personal belongings appears rationally related to that legitimate penological interest rather than imposed as a punishment without adjudication.  See Bell, 441 U.S. at 535-39 ( requiring that the conditions of confinement would be rationally related to some legitimate governmental purpose rather than imposed as punishment).

alleging forfeiture of personal belongings are barred by the NJTCA and will be dismissed with prejudice.[12]

### E.      Access-to-the-Courts Claim

In addition to the foregoing, Thomas seemingly added a new claim asserting that EJSP officials unduly interfere with his ability to communicate to this Court.  Same as the allegations discussed supra, Thomas' claim to that effect is facially without merit.

Addressing the issue of inmates' right of access to the courts, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers." Bounds v. Smith, 430 U.S. 817, 828 (1977).  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Lewis v. Casey, 518 U.S. 343, 355 (1996) (emphasis removed).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue a viable claim or defense directly or collaterally related to his criminal prosecution or his conditions of their confinement.  See Lewis, 518 U.S. at 348-51, 354-55; Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997); see also Salkeld v. Tennis, 248 Fed. App'x 341, 342 (3d Cir. 2007) (the

---

[12]  The Court's dismissal of Plaintiffs' property-based claims with prejudice shall not be construed as a bar on – or as an expression of this Court's opinion as to the substantive or procedural propriety of – Plaintiffs' bringing state actions under the NJTCA.

injury requirement is not satisfied by just any type of frustrated legal claim).  "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement . . . . Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of [his conditions of confinement] that he was unable to file even a complaint." Lewis, 518 U.S. at 351.

Consequently, in Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim.  The Supreme Court guided that, in order to state a claim for denial of access to courts, the inmate must assert fact(s) showing each of the following three elements: (1) a non-frivolous, underlying legal claim that the inmate was pursuing in connection with his criminal prosecution or his conditions of confinement; (2) the official acts successfully frustrating that particular litigation in the sense that (3) an actual loss of claim or defense resulted from such frustrative actions hence giving a basis to grant remedy that may be awarded as recompense but that is not otherwise available in the frustrated suit.  See id. at 415.

Here, Thomas' allegations that EJSP officials are frustrating his latest communications to this Court fails to meet the Christopher criteria, since this Court's dismissal with prejudice of the claims addressed in prior sections of this Opinion was based on Thomas' failure to assert facts amounting to a viable claims rather than on Thomas' insufficient amount of filings or his inability to meet a certain technical requirement.  See Hoffenberg v. Grondolsky, 2010 U.S. Dist. LEXIS 40923, at *17-19 (D.N.J. Apr. 27, 2010) (generally, access-to-the-courts challenges duly assert loss of a legal right if these challenges address the events associated with the litigant's prior rather than instant matter; this is so because a litigant fails to state a viable assess claim if

(s)he asserts that (s)he is prevented from frequent communications with the court in the instant matter while the court dismisses the litigant's claims not for lack of prosecution but on other grounds, e.g., for failure to state a cognizable claim).  Therefore, Thomas' assess claims will, too, be dismissed with prejudice, and his application for injunctive relief – associated with this claim – will be denied.

 **F.**  **Reduction and Denial of Treatment/Therapy**

  **1.**  **Plaintiffs' Claims as Reflected in Complaint I**

 Finally, Plaintiffs assert that their therapy/treatment were unduly affected by their transfer to the EJSP.[13]

 The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, with the latter protecting fundamental rights which are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  Palko v. Conn., 302 U.S. 319, 325 (1937).

_____

 [13] Theoretically, Plaintiffs' claims could be construed as addressing the gap in treatment Plaintiffs suffered as a result of their transfer to the ESJP or as focusing on the quality/quantity of the treatment they are provided at the EJSP.  However, since an inmate has no liberty interest in a particular housing assignment within a prison system, see McKune v. Lile, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise"), and brief interruptions of prison services associated with transfers from one facility to another are unavoidable and do not violate inmates' rights, see Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (a relatively brief interruption in an otherwise-adequate course of inmate's treatment does not amount to a constitutional violation unless the underlying medical condition is such that even a brief interruption threatens the inmate's life), this Court construes Plaintiffs' claims as challenging solely the diminished magnitude of their treatment in the EJSP, since: (a) Plaintiffs do not assert that their very lives depend on their psychiatric treatment; and (b) Thomas' supplement to his complaint states that the gap in treatment associated with the transfer from the Kearney Facility to the EJSP was very brief.

Consequently, substantive due process protects the inmates' fundamental rights and, in addition, guards the inmates against government conduct which is so egregious that it "shocks the conscience," even if this conduct does not implicate any specific fundamental right.  See United States v. Salerno, 481 U.S. 739, 746 (1987).

The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment.  See Youngberg, 457 U.S. at 316, 319 and 322; see also Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002).  In Leamer, the Court of Appeals held that, since the New Jersey's statutory scheme for sex offenders was predicated on the inmate's response to treatment, that statutory regime created a fundamental due process liberty interest in treatment.  See Leamer, 288 F.3d at 545; accord Hendricks, 521 U.S. at 368-69 (inmates housed in prison-like conditions must be afforded a treatment comparable to that provided to other civilly committed persons confined in treatment units); but see Bailey v. Gardebring, 940 F.2d 1150, 1153-54 (8th Cir. 1991), cert. denied 503 U.S. 952 (1992) (concluding that a sexually violent predator had no due process right to "psychiatric treatment to overcome a 'sexual offender condition'"); Semler v. Ludeman, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010) (following Bailey for the conclusion that there was no "recognized constitutional right to effective 'treatment' in the context of civilly committed sex offenders" and citing Nicolaison v. Ludeman, 2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008), the case finding that Youngberg "only recognized a right to 'minimally adequate' treatment that reduces the need for restraints [rather than a] comparable right to treatment that facilitates release").

The Court, following the Court of Appeals' guidance in Leamer, finds that Plaintiffs have substantive due process right in treatment facilitating their release prospects.  That leaves the Court with the inquiry as to what particular treatment is due.  For the answer to this inquiry, the Court turns to the relevant body of Eighth Amendment law, since the Fourteenth Amendment affords pretrial detainees and civilly committed individuals such as Plaintiffs protections that are "at least as great as the Eighth Amendment protections afforded to a convicted prisoner."  Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir.2003) (quoting City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)).

For the purposes of Eighth Amendment, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical need."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).   The Court of Appeals, however, clarified in Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987), that the correctional personnel may manifest "deliberate indifference" by denying medical care if such "denial exposes the inmate 'to undue suffering or the threat of tangible residual injury."  Id. at 346 (quoting Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)).  Moreover, in White v. Napoleon, 897 F.2d 103 (3d Cir. 1990), the Court of Appeals pointed out that the officials' acts effectively denying or delaying a prescribed medical treatment for non-medical reasons violate the requirements set forth by the Eighth Amendment.  See id. at 110 ("'deliberate indifference to, and defiance of, explicit medical instructions, resulting in serious and obvious injuries' stated a violation of constitutional rights") (quoting Martinez v. Mancusi, 443 F.2d 921, 924-25 (2d Cir. 1970)); see also Lanzaro, 834 F.2d at 346 (deliberate indifference is demonstrated "[w]hen … prison authorities prevent an inmate from receiving recommended

treatment for serious medical needs"); <u>accord</u> <u>Inmates of Allegheny County Jail v. Pierce</u>, 612

F.2d 754, 762 (3d Cir. 1979) ("Courts will disavow any attempt to second-guess the propriety or

adequacy of a particular course of treatment … [which] remains a question of sound professional

judgment.  Implicit in this deference to prison medical authorities is the assumption that such

informed judgment has, in fact, been made") (internal quotation and citation omitted).

Since, here, Plaintiffs assert that, for a decade, they were receiving a certain psychiatric

treatment at the Kearny Facility (which assertion, in turn, suggests that this particular treatment,

including its amount and depth, were medically prescribed to Plaintiffs rather than accidentally

rendered by Kearny officials year after year), but the amount and/or depth of that treatment was

materially reduced upon Plaintiffs' arrival to the EJSP, the Court concludes that Plaintiffs duly

asserted facts plausibly suggesting a violation of their substantive due process rights, and will

proceed Plaintiffs' claim based on reduction of medical treatment past the <u>sua</u> <u>sponte</u> dismissal

stage, and will direct Defendants to answer this line of Plaintiffs' challenges.  <u>See</u> <u>Fowler</u>, 578

F.3d at 210-211 (detailing the plausibility standard).

### 2.    Thomas' Claim Set Forth in Civil Action No. 10-5026 (DRD)

#### a.    Substantive Validity of Allegations

In addition to the foregoing, the Court notes Thomas' challenges asserted in Civil Action

No. 10-5026 (DRD).  In that matter, Thomas elaborates on his denial-of-medical-treatment

claims and states that, since being placed in EJSP segregated confinement, Thomas has been

completely denied treatment/therapy.  Thomas' allegations facially state a substantive due

process claim under the holding of <u>Leamer</u>.  Indeed, the circumstances addressed by the Court of

Appeals in <u>Leamer</u> were virtually identical to those pained by Thomas in Civil Action No. 10-

5026 (DRD), since the inmate in <u>Leamer</u> – same as Thomas – was completely denied treatment upon being placed in segregated confinement.  The Court of Appeals found such decision by prison officials constitutionally unfirm, observing that the inmate had "a 'mental aberration' and [was] in need of 'specialized treatment.'  That . . . automatically subjected him [to confinement] permitted by law unless he [was] cured . . . .  Neither good behavior, parole policies, or other credits [could] affect the term of his [confinement].  Only successful therapy [could] shorten his incarceration.  Therapy [was] thus an inherent and integral element of the scheme, and its deprivation [was] clearly a grievous loss not [envisioned by the scheme and triggering the analysis as to a potential violation of] constitutional guarantees."  <u>Leamer</u>, 288 F.3d at 544.

Since this Court finds it warranted to proceed, past <u>sua sponte</u> dismissal, Thomas and Nash's claims that their treatment was materially diminished (either in depth or in frequency, or in both respects), the Court <u>a fortiori</u> finds it warranted to proceed past the <u>sua sponte</u> dismissal stage Thomas' claim that all treatment has been completely denied to him.

### b.    Duplicative Litigation

Thomas' claims challenges asserted in Civil Action No. 10-5026 (DRD) appear derivative from the challenges Thomas raised in Civil Action No. 10-1887 (DRD), since all underlying key issues proceeded past the <u>sua sponte</u> dismissal stage in both actions are virtually identical.  Therefore, Civil Action No. 10-5026 (DRD) is duplicative of Civil Action No. 10-1887 (DRD).

> The power of a federal court to prevent duplicative litigation is intended "to foster judicial economy and the 'comprehensive disposition of litigation,'" <u>Curtis v. Citibank, N.A.</u>, 226 F.3d 133, 138 (2d Cir. 2000) (quoting <u>Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co.</u>, 342 U.S. 180, 183 (1952)),

and "to protect parties from 'the vexation of concurrent litigation over the same subject matter.'" Id. (quoting Adam v. Jacobs, 950 F.2d 89, 93 (2d Cir. 1991)).

Porter v. NationsCredit Consumer Disc. Co., 2003 Bankr. LEXIS 933, at *33 (Bankr. E.D. Pa. 2003).

Consequently, the Court will construe Thomas' complaint filed in Civil Action No. 10-5026 as Thomas' second supplement to his Complaint I filed in Civil Action No. 10-1887, and will direct the Clerk to administratively terminate Civil Action No. 10-5026, file Thomas' second supplement in Civil Action No. 10-1887 and add the defendants named in Civil Action No. 10-5026 as defendants in Civil Action No. 10-1887.

## V.   APPOINTMENT OF COUNSEL

Finally, the Court notes Thomas' application for appointment of pro bono counsel. See Civil Action No. 10-1887, Docket Entry No. 7.

Although a plaintiff does not have a constitutional or statutory right to an attorney, see Parham v. Johnson, 126 F.3d 454, 456-57 (3d Cir. 1997); Mallard v. United States Dist. Court for the S. Dist. of Iowa, 490 U.S. 296 (1989); Tabron v. Grace, 6 F.3d 147, 153 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994), a district court may seek legal representation by counsel for a plaintiff whose allegations "present the facts and legal issues [indicative of] a complex but arguably meritorious case." Tabron, 6 F.3d at 154 (3d Cir. 1993) (citing Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984)). Specifically,

> [i]f the district court determines that the plaintiff's claim has some merit, then the district court should consider the following factors:
> (1)    the plaintiff's ability to present his or her own case;
> (2)    the complexity of the legal issues;
> (3)    the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;

(4)  the amount a case is likely to turn on credibility determinations;
(5)  whether the case will require the testimony of expert witnesses;
(6)  whether the plaintiff can attain and afford counsel on his own behalf.

Tabron, 6 F.3d at 155-56.

This list of factors is not exhaustive, but instead should serve as a guide post for the district courts.  See Parham, 126 F.3d at 457-58.  Applying these factors to the pair of cases at bar, the Court finds appointment of counsel warranted since, here, resolution largely depends on determination of such issues as what psychiatric treatment/therapy was prescribed to Plaintiffs a decade ago, what psychiatric treatment/therapy has been provided to Plaintiff during the years of their stay at the Kearney Facility, and what psychiatric treatment/therapy, if any, is currently provided to Plaintiffs at the EJSP (as well as whether this current treatment is comparable to the treatment prescribed to specifically to Plaintiffs, in light of the holdings of Napoleon and Lanzaro, and to the treatment provided to an average SVP confined in a treatment unit, in light of Leamer and Hendricks).  Since such inquiry is likely to require testimony of expert witnesses and, in addition, entail an extensive factual investigation beyond Plaintiffs' abilities, and Plaintiffs – being indigent litigants – cannot afford counsel on their own, the Court finds appointment of counsel warranted and will direct the Clerk accordingly.

## VI.  __CONCLUSION__

For the foregoing reasons, Plaintiffs' applications to proceed in these matters in forma pauperis will be granted.  Plaintiffs' claims based on allegations other than denial of medical treatment will be dismissed with prejudice.  Thomas' application for injunctive relief will be denied, with prejudice, with regard to his access-to-the-courts claim.

Plaintiffs' claims asserting denial of medical treatment will be proceeded past the sua sponte dismissal, and Thomas' application for appointment of pro bono counsel will be granted. Thomas' application for injunctive relief with regard to denial of treatment will be dismissed without prejudice to being re-raised upon filing of an amended complaint.

The Clerk will be directed to file all complaints, administratively terminate Civil Action No. 10-5026, the persons named as defendants in Civil Action No. 10-5026 as defendants in Civil Action No. 10-1887, and consolidate Civil Action No. 10-1887 with Civil Action No. 10-2113.

Appointed counsel will be directed to file an amended consolidated complaint on behalf of both Plaintiffs and, if the factual circumstances render such application warranted, move this Court for an appropriate injunctive relief.

A proper Order accompanies this Opinion.

   *s/ Dickinson R. Debevoise*
   **DICKINSON R. DEBEVOISE,**
   **United States District Judge**

Dated: October 15, 2010